Filed 1/31/14  Marriage of Schulman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of RICHARD and LYNN A. SCHULMAN. | D063341 |
| RICHARD A. SCHULMAN, | |
| Appellant, | (Super. Ct. No. D518356) |
| v. | |
| LYNN A. SCHULMAN, | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Rubin, Christine K. Goldsmith, Judges.  Affirmed.

Hecht Solberg Robinson Goldberg & Bagley and Jerold H. Goldberg, Amanda A. Allen, and Joshua A. Sonné for Appellant.

Sandler, Lasry, Laube, Byer & Valdez and Edward I. Silverman; Lowenstein Brown and Michele Sacks Lowenstein for Respondent.

Richard Schulman appeals from a judgment dissolving his marriage to Lynn Schulman. He raises numerous contentions relevant to the court's rulings on child custody, attorney fees, and spousal support. Relevant to child custody, he argues the trial court erroneously (1) granted Lynn's motion to quash subpoenas he issued to the parties' marriage counselor and (2) excluded testimony on hearsay grounds. Concerning attorney fees, he contends the court erred at the conclusion of trial by (1) ordering him to pay an additional $20,000 to Lynn for her attorney fees, and (2) declining to order Lynn to refund $4,500 he had paid to her under an earlier attorney fees award. With respect to spousal support, he asserts the court (1) failed to consider the required statutory factors, (2) violated a stipulation between the parties not to consider Lynn's debt, and (3) used an incorrect separation date.

We conclude there was no reversible error and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The parties were married for almost 10 years when Richard filed for divorce. They had one child (Olivia) who was seven years old at the time of trial. Before trial, the parties had resolved issues related to property division, and the court had issued interim orders relating to child custody, child support, spousal support, and attorney fees. The issues at trial focused on permanent child custody; child support and spousal support; attorney fees; and ancillary issues concerning the interpretation of a pretrial stipulation and the date of separation. Richard maintained that Olivia's primary residence should be with him, not Lynn. For purposes of addressing his custody claims, during the pretrial proceedings Richard issued subpoenas to the parties' marriage and family counselor, and

2

the trial court granted Lynn's motion to quash the subpoenas based on the psychotherapist-patient privilege.

At the conclusion of the trial, the court awarded the parties joint legal and physical custody, with the primary residence with Lynn and a 40 percent timeshare with Richard. The court ordered Richard to pay child support, pay spousal support for three more years, and make an additional contribution to Lynn's attorney fees.

We will present additional facts in our discussion section as we address each of Richard's contentions.

## DISCUSSION

### ISSUES RELEVANT TO CHILD CUSTODY

Richard argues the trial court (1) erred in applying the psychotherapist-patient privilege to grant Lynn's motion to quash his subpoenas to the parties' marriage and family counselor, and (2) incorrectly applied the hearsay rule to exclude his testimony about Olivia's state of mind.

I. *Granting of Motion To Quash Based on Psychotherapist-Patient Privilege*

A. *Background*

Before trial, Richard issued subpoenas to secure the testimony and production of documents from David Peters, a marriage and family therapist consulted during the marriage. In support of her motion to quash, Lynn claimed the sessions with Peters were confidential under the psychotherapist-patient privilege. She submitted a declaration stating that between 2006 and 2009 she and Richard had about 50 marriage counseling sessions with Peters to seek "diagnosis, preventative and curative treatment for the

3

emotional problems related to [their] marriage" and "in hopes of reconciling and mending" their relationship.

In response, Richard asserted the privilege was inapplicable because although Lynn had agreed to go to marital counseling, she was not seeking treatment for an emotional condition. Richard submitted a declaration stating that Lynn had repeatedly said during and outside the sessions that "she did not have an emotional condition for which treatment would be appropriate," and she refused to follow Peters's suggestion that the parties seek insurance coverage for the sessions by characterizing them as treatment of an emotional condition. Richard stated that he likewise was not seeking treatment for an emotional condition, and the sessions were "about several aspects of the relationship, primarily [their] conduct towards each other, parenting of Olivia, and money."

Richard maintained that information from Peters was relevant to child custody because Peters was the "most knowledgeable neutral third party" on issues related to Olivia's interests, including such matters as Lynn's admission during joint sessions that her fears that Richard was an incompetent parent were groundless; Richard's expressed concerns that Lynn was manipulating Olivia in a harmful manner; and Peters's anticipated testimony about Lynn's inability to compromise.

Lynn submitted a reply stating that information from Peters would be irrelevant because the parties had already met with a family mediator (Dr. Lori Love) who had recommended a "gradual 50/50 timeshare"; Richard was opposed to this; and Richard was "unnecessarily blowing this case out of proportion" by serving subpoenas on their marriage counselor.

4

The trial court granted Lynn's motion to quash, finding that Lynn could properly claim the psychotherapist-patient privilege with respect to the marriage counseling with Peters.

B. *Analysis*

Richard argues that Lynn could not properly assert the psychotherapist-patient privilege because she was not a patient within the meaning of the statutory privilege.

Generally, a patient has a statutory privilege to refuse to disclose, and to prevent another from disclosing, confidential communications between the patient and a psychotherapist. (Evid. Code, § 1014; *Simek v. Superior Court* (1981) 117 Cal.App.3d 169, 173.) The privilege can properly be applied in cases involving child custody disputes between parents. (*Simek, supra*, at pp. 173-174; see *Koshman v. Superior Court* (1980) 111 Cal.App.3d 294, 297; *Manela v. Superior Court* (2009) 177 Cal.App.4th 1139, 1142-1143, 1146.) When multiple persons are joint holders of the privilege, waiver of the privilege by one joint holder does not affect the right of another joint holder to claim the privilege. (Evid. Code, § 912, subd. (b); see *Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1096 [all joint holders of attorney-client privilege must consent to disclosure].)

For purposes of the psychotherapist-patient privilege, the term "patient" is defined in Evidence Code section 1011 as including "a person who consults a psychotherapist . . . for the purpose of securing a diagnosis or *preventive, palliative, or*

5

*curative treatment of his mental or emotional condition . . . ."* (Italics added.)[1] Richard does not dispute that Peters, a marriage and family therapist, qualifies as a psychotherapist under the statutory scheme. The statute explicitly includes marriage and family therapists within the definition of psychotherapists who are covered by the privilege. (Evid. Code, § 1010, subd. (e).) Nevertheless, Richard asserts that Lynn was not a patient under the statutory scheme because the parties consulted Peters for purposes of working on their *marital relationship*, not for purposes of treating Lynn's *individual emotional condition*.

To resolve this issue, we first interpret the statutory definition of "patient" as a question of law (see *In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 288), and then decide whether the record supports the trial court's decision to apply the privilege to the particular facts of this case (*Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417, 442).

When interpreting a statute, we seek to effectuate legislative intent, and we give the words of the statute their ordinary and usual meaning and construe them in the context of the statute as a whole. (*In re Marriage of Fong, supra*, 193 Cal.App.4th at p. 288.) The purpose of the psychotherapist-patient privilege is to encourage full therapeutic disclosure of intimate emotional matters to advance society's interest in

---

1    Evidence Code section 1011 states: "As used in this article, 'patient' means a person who consults a psychotherapist or submits to an examination by a psychotherapist for the purpose of securing a diagnosis or preventive, palliative, or curative treatment of his mental or emotional condition or who submits to an examination of his mental or emotional condition for the purpose of scientific research on mental or emotional problems."

healthy, safe communities.  As stated in a legislative comment to Evidence Code section 1014:

> "Psychoanalysis and psychotherapy are dependent upon the fullest revelation of the most intimate and embarrassing details of the patient's life. . . .  Unless a patient . . . is assured that such information can and will be held in utmost confidence, he will be reluctant to make the full disclosure upon which diagnosis and treatment . . . depends.  [¶]  The Law Revision Commission has received several reliable reports that persons in need of treatment sometimes refuse such treatment from psychiatrists because the confidentiality of their communications cannot be assured under existing law.  Many of these persons are seriously disturbed and constitute threats to other persons in the community. . . .  Although it is recognized that the granting of the privilege may operate in particular cases to withhold relevant information, the interests of society will be better served if psychiatrists are able to assure patients that their confidences will be protected."

(Sen. Com. on Judiciary, com. reprinted at 29B Pt. 3B, West's Ann. Evid. Code (2009 ed.), foll. § 1014, p. 18.)

This societal interest in healthy, safe communities is advanced by providing a confidential forum for parties to work on the preservation of a marriage, particularly when minor children are involved.  The marriage and family therapist licensing statute underscores the importance of this type of therapy to the public welfare:  "Many California families and many individual Californians are experiencing difficulty and distress, and are in need of wise, competent, caring, compassionate, and effective counseling in order to enable them to improve and maintain healthy family relationships. [¶]  Healthy individuals and healthy families and healthy relationships are inherently beneficial and crucial to a healthy society, and are our most precious and valuable natural resource.  Marriage and family therapists provide a crucial support for the well-being of

7

the people and the State of California." (Bus. & Prof. Code, § 4980, subd. (a).)  As recognized in *Simrin v. Simrin* (1965) 233 Cal.App.2d 90, the efficacy of marriage counseling can be significantly diminished if the sessions are not afforded confidentiality protection:  "[P]ublic policy . . . strongly favors procedures designed to preserve marriages, and counseling has become a promising means to that end. . . .  If a husband or wife must speak guardedly for fear of making an admission that might be used in court, the purpose of counseling is frustrated." (*Id.* at p. 95 [holding that trial court properly allowed rabbi who provided marriage counseling to decline to testify based on agreement with parties that sessions would be confidential]; see *Kinsella v. Kinsella* (N.J. 1997) 696 A.2d 556, 582.)

Turning to the language used by the Legislature when defining who is a patient for purposes of the psychotherapist-patient privilege, the reference in Evidence Code section 1011 to a person who seeks "palliative . . . treatment" of a "mental or emotional condition" is broad enough to encompass treatment for the emotional disturbances experienced in a marital relationship.  "Palliative" describes a process designed to "moderate the intensity of" something, and a "condition" is "a state of being." (Webster's Collegiate Dict. (10th ed. 2002) pp. 240, 835.)  Thus, in its common meaning, a consultation for palliative treatment of an emotional condition means therapeutic sessions to improve an emotional state.  By using this broad, general language, the Legislature did not require that the emotional condition consist of an individual's particular psychological illness as opposed to the general emotional distress experienced by a spouse facing marriage problems.  Marital difficulties can give rise to intense emotions that can, in

8

common parlance, be classified as an emotional condition suffered by one or both of the spouses.

Further, the fact that the Evidence Code explicitly includes marriage and family therapists within the definition of psychotherapists covered by the psychotherapist-patient privilege (Evid. Code, § 1010, subd. (e)), suggests that the Legislature intended to extend the privilege to counseling directed at a marital relationship. Although marriage and family therapists may treat persons for their individual emotional problems, they also treat patients who are simply trying to save or improve their marriage. The inclusion of marriage and family therapists in the statutory scheme, with no differentiation as to the types of problems they are treating, supports that therapy related to marriage difficulties properly falls within the purview of treatment for an emotional condition.

Considering the broad statutory language and the public policy interest in providing confidential counseling for the preservation of marriages, the definition of "patient" in Evidence Code section 1011 properly includes persons seeking treatment for problems in a marital relationship even if the treatment does not concern a particular emotional illness suffered by the person.[2]

---

[2] Citing *People v. Cabral* (1993) 12 Cal.App.4th 820, at page 827, Richard argues that the term "patient" in Evidence Code section 1011 should be narrowly construed. *Cabral* made a statement to this effect in the context of deciding whether the privilege could be invoked by a defendant who sent a letter to a psychotherapist in the hopes of receiving probation instead of prison. (*Cabral*, at pp. 825, 827-828.) Even assuming arguendo that the reference to "patient" should be narrowly interpreted, for the reasons stated above, a party who seeks marital counseling can readily qualify as a patient.

Likewise, we find no error in the court's conclusion that under the particular circumstances of this case Lynn was a patient qualified to assert the privilege. As the claimant of the privilege, Lynn had the initial burden to prove the existence of the preliminary facts essential to the privilege, including that she was a patient within the meaning of the statute. (*Roman Catholic Archbishop of Los Angeles v. Superior Court, supra*, 131 Cal.App.4th at p. 442 & fn. 12.) We review the trial court's decision under the substantial evidence standard, drawing all reasonable inferences in favor of its determination. (*Ibid*.) Lynn stated the counseling sessions were designed to treat emotional problems related to the marriage and an effort to preserve the marriage, and Richard acknowledged the parties discussed their conduct towards each other and parenting concerns. The trial court could reasonably deduce that these are emotionally-charged topics in the marital relationship, which established that Lynn was seeking treatment for an emotional condition so as to qualify her as a patient within the meaning of the psychotherapist-patient privilege.

Contrary to Richard's suggestions, the circumstances presented here are not akin to those in *In Re Tabatha G.* (1996) 45 Cal.App.4th 1159 and *Mahoney v. Superior Court* (1983) 142 Cal.App.3d 937. In *Tabatha G.*, we held the psychotherapist-patient privilege did not apply to a bonding study designed to obtain evidence to prevent the termination of a mother's parental rights because the mother was not seeking diagnosis or treatment of a mental or emotional condition. (*Tabatha G., supra*, at p. 1168.) In contrast here, Lynn's pursuit of counseling for marital difficulties constituted treatment of a condition related to her emotions so as to satisfy the definition of a patient. In *Mahoney*, the

10

appellate court declined to grant mandamus relief to overturn a trial court's discovery ruling refusing to apply the psychotherapist-patient privilege to communications that purportedly occurred during marriage counseling, in a case where the petitioner failed to provide an adequate record to permit review of his claim. (*Mahoney, supra*, at pp. 938-941.) Here, the record is adequately developed and supports the trial court's allowance of the privilege.

Richard also contends the privilege was waived because he was present during the marriage counseling sessions. If a third party's presence during a counseling session does not further the patient's interest or is not reasonably necessary to accomplish the counseling purpose, the confidentiality privilege is deemed waived. (Evid. Code, § 1012; see *Manela v. Superior Court, supra*, 177 Cal.App.4th at pp. 1146-1147.)[3] Richard was not an unconnected or unnecessary third party during the counseling sessions. To the contrary, as Lynn's spouse, his presence facilitated the counseling goal of addressing the parties' marital problems. (See *Farrell L. v. Superior Court* (1988) 203 Cal.App.3d 521, 527 [privilege applied to patient participating in group therapy sessions].)

Our conclusion in this case does not foreclose the possibility that in limited circumstances the psychiatrist-patient privilege might properly yield to a countervailing interest in ensuring a full and proper determination of a child custody dispute. (See

---

[3]    For purposes of the psychotherapist-patient privilege, Evidence Code section 1012 defines a " 'confidential communication' " as information transmitted by a means which "discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation, or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted . . . ."

11

*Koshman v. Superior Court, supra*, 111 Cal.App.3d at p. 299, fn. 5; *Kinsella v. Kinsella, supra,* 696 A.2d at pp. 581, 583; see also *Palay v. Superior Court* (1993) 18 Cal.App.4th 919, 927-928; *Farrell L. v. Superior Court, supra*, 203 Cal.App.3d at pp. 527-528.) However, as stated in *Kinsella*, the psychotherapist-patient privilege should be pierced in child custody cases "only after careful balancing of the policies in favor of the privilege with the need for disclosure in the specific case before the court. . . . [¶] [T]he courts must strike a balance between the need to protect children who are in danger of abuse or neglect from unfit custodians and the compelling policy of facilitating the treatment of parents' psychological or emotional problems. . . . [¶] [O]nly in the most compelling circumstances should the courts permit the privilege to be pierced." (*Kinsella, supra*, at pp. 581, 583, 584.)[4]

In this vein, Richard asserts that the trial court should have allowed Peters to testify because his testimony "would bear directly on the most important issue at trial, Olivia's long-term emotional well-being." Richard has not shown that information from Peters was so essential to the protection of Olivia's interests that it compelled the trial court to disregard the psychotherapist-patient privilege.

---

[4]     The courts have noted that when balancing the competing concerns for therapeutic confidentiality and proper child custody placements, a relevant factor to consider is that the child's best interests can also be served by securing a *court-ordered* mental examination of a parent, rather than piercing the psychotherapist-patient privilege that attaches to the parent's treating therapist. (*Simek v. Superior Court, supra*, 117 Cal.App.3d at p. 177; *Kinsella v. Kinsella, supra*, 696 A.2d at pp. 579-580, 583; see Evid. Code, §§ 730, 1017; Fam. Code, § 3111; *In re Marriage of Kim* (1989) 208 Cal.App.3d 364, 372.)

12

The record supports that Richard presented extensive evidence relevant to the child custody issue, including testimony from himself, Lynn, Olivia's pediatrician, and family mediator Dr. Love. Dr. Love submitted a detailed report and testified concerning her assessments and recommendations for a child custody arrangement. The trial court issued permanent custody orders awarding the parties joint legal and physical custody, with primary residence to Lynn, and increasing Richard's timeshare from 32 percent to 40 percent. In its detailed statement of decision, the court summarized Olivia's history of health problems arising from her premature birth; Lynn's role as Olivia's primary nurturer since birth; Lynn's mother's role as Olivia's sole daycare provider; Lynn's pursuit of therapeutic measures to address Olivia's health challenges; and Olivia's successful performance at school. The court assessed that both parents were devoted to their daughter, and although they had "strikingly dissimilar" parenting styles, they were both capable parents. The court determined that given Olivia's "improving health and maturity" it was appropriate for her to spend larger portions of time with Richard, and the court set forth the 40 percent timeshare schedule with Richard.

The record shows that Richard had a full opportunity to present information to the court relevant to custody without recourse to the confidential therapy sessions with Peters. The trial court did not err in applying the psychotherapist-patient privilege to the marriage counseling sessions.

## II. *Exclusion of Testimony on Hearsay Grounds*

Richard asserts the trial court exacerbated the error arising from the exclusion of Peters's testimony by erroneously applying the hearsay rule to exclude his testimony

about Olivia's mental state which was relevant to the custody issue. He cites two instances during his trial testimony when he proffered statements made by Olivia to support his claim that Lynn was manipulating Olivia in a harmful way: (1) Olivia said it was her fault that she fell off a swing (whereas Richard claimed the fall was Lynn's fault and Lynn made Olivia think it was Olivia's fault), and (2) Olivia asked Richard why he wanted to "split apart the family." Responding to Lynn's hearsay objections, Richard argued he was not offering the statements to prove the truth of what Olivia said. The court disagreed, and sustained the objections.

Richard asserts the court's hearsay rulings were erroneous because the statements were admissible to show Olivia's state of mind which reflected the psychological harm she was suffering in Lynn's care. We need not evaluate the merits of the hearsay issue, because even assuming error, Richard has not shown prejudice.

"[E]ven where a trial court improperly excludes evidence, the error does not require reversal of the judgment unless such error resulted in a miscarriage of justice. . . . [Appellant] has the burden to demonstrate it is reasonably probable a more favorable result would have been reached absent the error." (*Poniktera v. Seiler* (2010) 181 Cal.App.4th 121, 142.) As stated, Richard presented extensive evidence relevant to the custody issue, including detailed information from Dr. Love regarding each parent's concerns about the other's parenting (including Richard's concerns about Olivia saying the swing incident was her fault). Richard has not shown that it is reasonably probable that admission of his testimony about Olivia's two comments to him would have altered the trial court's custody decision. Indeed, Richard implicitly concedes the exclusion of

14

this evidence was harmless because he does not present this claim as a stand-alone argument for reversal, but couples it with his claim of prejudice arising from the exclusion of Peters's testimony and acknowledges that "[b]y itself, this [hearsay error] would be immaterial."

## ISSUES RELEVANT TO ATTORNEY FEES AND SPOUSAL SUPPORT

Richard challenges the trial court's rulings at the conclusion of trial (1) ordering him to contribute an additional $20,000 to Lynn's attorney fees; (2) declining to order that Lynn refund him $4,500 for his earlier attorney fees payment; and (3) ordering him to pay $1,100 monthly spousal support for three more years after trial.

### I. *General Background*

Richard is a land use attorney and Lynn is a school teacher. At the time of trial in June 2012, Richard was 57 and Lynn was 50. The court found that Richard's monthly income was $12,750 gross and $8,082 net, and Lynn's was $5,760 gross and $4,128 net. According to the parties' income and expenses declarations, Richard paid a monthly rent of $2,295 and had $19,939 in cash assets. Lynn resided with her mother; her monthly rent was $1,500; and she had $500 in cash assets. The court found that Richard's monthly expenses were about $6,500, and Lynn's were about $5,800.[5]

During pretrial proceedings, Richard was ordered to pay $1,400 temporary monthly spousal support. At the conclusion of the trial, the court ordered that Richard

---

[5] Lynn listed her monthly expenses as $6,800, which the court found "a bit high" and lowered to $5,800.

pay $1,100 monthly spousal support for three more years, and $831 monthly child support.

As we shall detail below, during the course of the litigation both parties incurred substantial attorney fees, with Lynn's reaching over $120,000 at the outset of trial. Richard retained counsel at the commencement of the litigation in 2009, spending about $76,000 in fees. In January 2011, he began representing himself, and used a family law attorney for consultation purposes. In several pretrial rulings, Richard was ordered to contribute $35,000 to Lynn's fees under the need-based Family Code provisions. (Fam. Code, §§ 2030, 2032.)[6] Lynn had borrowed over $100,000 from her mother to pay for her fees, and at trial she requested that Richard be ordered to pay an additional $65,000 for her fees. In its decision after trial, the court ordered Richard to contribute another $20,000 to Lynn's fees.

## II. *Attorney Fees*

Richard argues the trial court's award of an additional $20,000 fees to Lynn was erroneous because the award was (1) duplicative of an earlier attorney fees award, (2) barred under res judicata principles, and (3) an abuse of discretion given Lynn's access to funds from her mother to pay for the litigation. Richard also contends that under a stipulation reached by the parties, the court was required to order Lynn to refund him $4,500 in fees he had paid pursuant to a previous court order.

---

[6]    Subsequent unspecified statutory references are to the Family Code.

16

To review Richard's challenges to the court's attorney fees rulings at the conclusion of trial, we first summarize the various fee awards made to Lynn during the course of the proceedings, and then evaluate the propriety of the court's ultimate order at the end of trial.

### A. *Fee Awards to Lynn*

During the course of the proceedings, Richard was ordered to contribute to Lynn's attorney fees in four orders, as follows.

(1) On October 22, 2010, he was ordered to contribute $8,000, payable at a rate of $500 per month. Richard paid $4,500 toward this award, and then stopped making payments (leaving a balance of $3,500) after the parties reached a stipulation on attorney fees in July 2011.

(2) On July 22, 2011, the parties filed a stipulated order requiring Richard to contribute $15,000 for Lynn's fees, which was in complete satisfaction of his fee obligation *through the date of the stipulation*.[7]

(3) On October 25, 2011, Richard was ordered to contribute $12,000 (payable at a rate of $500 per month) for fees incurred *after* the July 2011 stipulation. These fees were

---

[7]    The July 2011 stipulation states: "Each party shall be responsible for his/her own attorney's fees, costs and expenses incurred through the effective date of this Stipulation, except that Husband shall, as described above (under 'Division of Retirement/Pensions') transfer to Wife the sum of $15,000 pursuant to a qualified domestic relations order. *This single $15,000 payment is in full and complete satisfaction of Husband's obligations to Wife's attorney fees, costs and related litigation through the date of this Stipulation.* In recognition of the implied covenant of good faith and fair dealing, the Court shall not use any of either party's debt or debt service for fees incurred through the date of this Stipulation as a basis for making a decision with respect to any amount or duration of spousal support to Wife." (Italics added.)

17

awarded at the conclusion of the hearing on Lynn's motion to quash the subpoenas issued to the parties' marriage counselor, and were based on Lynn's request for fees to pay for the motion to quash and for the upcoming trial. In support of this fee request, Lynn's counsel stated that Lynn had incurred additional fees of about $7,000 for work already performed but not yet billed; most of these fees were attributable to preparation of the motion to quash; and she would incur more fees for additional preparation and appearance at the motion to quash hearing.[8] Further, Lynn's counsel estimated that fees for trial preparation and participation would be about $30,000 to $40,000.

(4) At the conclusion of the June 2012 trial, the court ordered Richard to contribute another $20,000 to Lynn's fees, payable at a rate of $250 per month. Lynn had requested an additional $65,000 fee contribution from Richard, which was based on: (a) $32,379.43 in fee billings after the July 2011 stipulation (i.e., billing statements from August 1, 2011 through May 22, 2012); (b) an estimated $10,000 for trial preparation time from May 23 through June 14, 2012; (c) additional preparation time from June 19 to the first day of trial on June 25 that had not yet been billed; and (d) an estimated $11,200

[8]      Lynn's request for fees for the motion to quash was made under both the Family Code needs-based statute (§ 2032), and a statute permitting fees for bad-faith, unjustified, or oppressive subpoenas. (Code Civ. Proc., § 1987.2.) When awarding fees at the motion to quash hearing, the court did not make any findings of bad faith/lack of justification/oppressiveness and focused on the parties' respective financial positions, thus suggesting the fees were pursuant to the Family Code.

for three and one-half to four days of actual trial time (i.e., from June 25 to June 28, 2012; $395 to $400 per hour for 28 hours) that had not yet been billed.[9]

In its written statement of decision after trial, the court explained how it calculated the $20,000 award, stating: (1) Lynn had incurred over $10,000 in fees for trial preparation work that had not yet been billed, and (2) the trial lasted three and one-half to four days; Lynn's counsel appeared in court for 22 to 25 hours and expended additional preparation time; and Lynn was billed at a reasonable rate of $395 per hour.[10] The court found that Richard had the ability to pay an additional $20,000 in fees, and that Lynn needed the contribution "to level the playing field."

### B. *Challenges to $20,000 Fee Award*

#### 1. *Contention that $20,000 Award Was Duplicative*

Richard argues the $20,000 award of fees at the conclusion of trial was an improper duplicative award because Lynn had *already received an award for trial preparation and participation* via the October 2011 award of $12,000 made at the motion to quash hearing.

---

[9] In a declaration signed on June 14, 2012, Lynn's counsel estimated that Lynn had incurred about $10,000 in trial preparation fees after the last billing statement on May 22, 2012. On the last day of trial on June 28, 2012, Lynn's counsel stated the actual amount for the billing period of May 23 through June 19, 2012 was $11,819. Counsel told the court she had not yet calculated the actual billings for the preparation time during the week before trial (June 19-June 25, 2012), nor for her actual trial time (June 25-June 28, 2012).

[10] Under these calculations set forth by the court, the trial appearance fees would be about $9,875 ($395 per hour × 25 hours of trial appearance).

The record supports that the $20,000 fee award was not duplicative because the award was for fees incurred by Lynn *in addition* to the fees covered by the $12,000 awarded at the motion to quash hearing. That is, (1) the $12,000 award in October 2011 could reasonably be allocated to the $32,379.43 fees from the billing cycle from August 1, 2011 to May 22, 2012; and (2) the $20,000 award at the conclusion of trial could reasonably be allocated to the more than $10,000 in fees for trial preparation from May 23 to June 25, 2012, and to the approximate $10,000 in fees for actual trial time from June 25 to June 28, 2012 (see fns. 9 & 10, *ante*).

Thus, the court could properly find that the $12,000 fee award made in October 2011 was fully absorbed by the $32,379.43 fees incurred up to May 22, 2012, covering both the motion to quash and trial preparation. Thereafter, Lynn incurred *more* fees totaling more than $20,000 for additional trial preparation and actual trial appearance. The record supports that the $20,000 award at the conclusion of trial was not duplicative.

2. *Contention that $20,000 Award Was Barred by Res Judicata*

Richard's assertion that the $20,000 fee award was barred under res judicata principles is also unavailing. The res judicata doctrine generally precludes relitigation of an identical claim when the prior proceeding resulted in a final order or judgment on the merits. (*People v. Barragan* (2004) 32 Cal.4th 236, 253; see *Estate of Keet* (1940) 15 Cal.2d 328, 333.) This doctrine promotes judicial economy and protects against vexatious litigation, and the courts consider these underlying policies when deciding whether the doctrine should be applied in a particular case. (*Barragan, supra*, at p. 256.)

20

For policy reasons in family law proceedings, an attorney fees order before the conclusion of the case may be deemed final for purposes of appealability (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1311), but it is *not* necessarily final for purposes of barring the trial court from further consideration of a fee award (*In re Marriage of Green* (1992) 6 Cal.App.4th 584, 593). As explained in *Green*, under the family law statutory scheme "*denials of fee requests in conjunction with interim motions, without more, cannot preclude the court from exercising its responsibility on this issue at the end of the case*. Trial courts have a duty to award appropriate attorney fees and costs pendente lite . . . . However, trial courts also have a duty at the conclusion of the case to make a just and reasonable award of attorney fees and costs, considering the circumstances of the parties." (*Ibid*., italics added.) To this effect, section 2030 authorizes the trial court to consider the issue of attorney fees in an ongoing fashion during the family law litigation, stating: "*The court shall augment or modify the original award for attorney's fees and costs as may be reasonably necessary* for the prosecution or defense of the proceeding, or any proceeding related thereto, including after any appeal has been concluded." (§ 2030, subd. (c), italics added; *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1056 [rejecting contention that earlier order denying fees precluded later award of fees].)

There is nothing in the October 2011 $12,000 fee order stating the award constituted a final determination on the fee issue in the pending litigation. To the contrary, when awarding the $12,000 fees at the conclusion of the motion to quash hearing, the court stated that "at this stage" it was ordering this fee contribution. This

21

language supports that the court was exercising its authority to make a pendite lite fee award and that the issue could be revisited at trial.

### 3. *Lynn's Access to Her Mother's Funds*

The court imposed the $20,000 fee award under sections 2030 and 2032, which authorize the court to order one party to contribute to the other party's attorney fees. Section 2030 requires the trial court to "ensure that each party has access to legal representation" by awarding fees "if necessary based on the income and needs assessments" and in "whatever amount is reasonably necessary" to maintain or defend the proceeding. (§ 2030, subd. (a)(1).) The statute requires the trial court to make findings as to whether an award of fees is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for both parties' representation. (§ 2030, subd. (a)(2).) If the court finds there is a disparity in access and ability to pay, it should award fees. (*Ibid.*)[11]

Further, section 2032 authorizes the court to make the section 2030 award if it is "just and reasonable under the relative circumstances" of the parties, based on a

---

[11]    Section 2030 states in part:  "(a)(1) In a proceeding for dissolution of marriage . . . the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party . . . whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding.  [¶]  (2) When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties.  If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs. . . ."

consideration of "the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately," and considering all relevant circumstances including income, assets, debts, earning capacity, and any other equitable factors. (§§ 2032, subds. (a), (b), 4320; *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 630.) When directing the court to consider the relative circumstances of the parties, section 2032 expressly states the requesting party's possession of financial resources to pay for fees does not alone preclude an award of fees: "The fact that the party requesting an award of attorney's fees and costs *has resources from which the party could pay the party's own attorney fees and costs is not itself a bar*" to an award of fees; rather "*[f]inancial resources are only one factor for the court to consider*" in determining how to equitably apportion the cost of the litigation. (§ 2032, subd. (b), italics added.)[12]

---

[12] Section 2032, subdivision (b) states: "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."

We review the trial court's attorney fees award for abuse of discretion. (*In re Marriage of Duncan, supra*, 90 Cal.App.4th at p. 630.) Under this standard, we must affirm the court's order unless no judge could reasonably make the ruling. (*Ibid.*)

Richard argues the $20,000 fee award was an abuse of discretion because Lynn had full access to representation given that her mother was funding the litigation; Lynn was not necessarily required to pay her mother back; he was operating at a deficit; and Lynn had high quality representation whereas he was forced to represent himself because of his diminishing funds.

Lynn and her mother testified at trial to explain how they were handling the financial arrangements between them. Lynn testified that she was paying her attorney fees from "[a]lmost every bit of [her] paycheck, spousal, child support, and a loan from [her] mother." Lynn now owed her mother $102,013 for legal fees, and her mother had written down each check that she paid to the attorney. Lynn had been making small, sporadic payments to her mother for the fees, but she had to save her money to pay for the fees at trial. Although Lynn and her mother had not executed a promissory note, they had an agreement that Lynn would pay her mother back, and her mother's payments were not considered an early inheritance.[13] Lynn had been unable to consistently pay the monthly rent owed to her mother because of the high legal fees, and her mother had

---

[13] Lynn testified there was no interest rate for the loan. Lynn's mother testified the interest rate would be decided when Lynn was able to begin repaying her.

suspended the rent until the month after trial.[14] Lynn's mother testified that when Lynn

had the money, she "[a]bsolutely" expected Lynn to begin paying rent again, including

the past due rent, and she had discussed this with Lynn.

In its written statement of decision, the trial court noted that Lynn's mother "has

funded this litigation" and found that "her mother has lent her money for this litigation."

Contrary to Richard's claim, the trial court was not required to find that the

litigation funding provided by Lynn's mother precluded an award of attorney fees to Lynn

under sections 2030 and 2032. The record shows that Richard's income was double that

of Lynn's, and that Lynn was relying on her mother to pay her attorney fees. These

circumstances support the court's finding that it was appropriate for Richard to contribute

to Lynn's fees. The court was entitled to credit the testimony of Lynn and her mother that

Lynn was expected to repay her mother for the monies advanced for the legal fees. It was

also not unreasonable for the court to conclude that Lynn's mother, who is *not* a party to

the proceedings, should not be required to finance the litigation for Lynn given that

Richard had a substantial income that could be used to assist Lynn with her fees. (See *In

re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 532 ["Parents are not obligated to pay

the costs of their children's divorces"]; see also *Kevin Q. v. Lauren W.* (2011) 195

Cal.App.4th 633, 645-647 [question of whether money from parents should be considered

---

14      After Lynn moved in with her mother in late July 2010, she paid rent for about
five months, and then was unable to pay because of the legal fees. Lynn stated on her
income and expense declaration that her monthly rent was $1,500. Lynn's mother
testified the rent was $1,100.

an asset for purposes of calculating support or attorney fees awards is one that must be left to discretion of trial court].)

Richard's contention that section 2030 precludes fees because Lynn had access to funds for legal representation through her mother is unavailing. Although the statute is designed to ensure each party's access to funds for representation, there is nothing in the statute that suggests a party with superior financial circumstances cannot properly be ordered to contribute to the other party's fees, even though the recipient party has a family member willing to loan money for the litigation. To the contrary, section 2032 makes clear that when the court is considering the parties' relative circumstances, the requesting party's financial resources is only one factor to consider. Here, the court did not abuse its discretion in finding that Richard should contribute to Lynn's fees so that the bulk of Lynn's fee burden did not rest solely on monetary contributions from Lynn's mother.

To the extent Richard challenges the court's fee award based on his claim that he was operating at a deficit, the record supports the trial court's finding that Richard was in a stronger financial position than Lynn given his larger income, and accordingly he should help pay for her fees. There is nothing in the record that shows Richard's financial circumstances were so precarious as to make the court's award of fees an abuse of discretion. Notably, the trial court provided Richard a reasonable financial accommodation by ruling that the $20,000 could be paid in $250 monthly installments.

C. *Denial of Richard's Request for a Fee Refund Based on the July 2011 Stipulation*

Richard asserts the trial court erred by failing to order a $4,500 refund of fees he had paid to Lynn because the refund was required under the terms of the July 2011 pretrial stipulation reached by the parties.

The dispute over the refund issue concerned the interplay between the October 2010 $8,000 attorney fees order, and the July 2011 $15,000 stipulated attorney fees order. Richard argued the July 2011 stipulation extinguished the October 2010 order; it was a complete satisfaction of all fee obligations through the July 2011 date of the stipulation; and hence he did not have to pay the $3,500 balance due under the October 2010 order and was entitled to a refund for the $4,500 he had paid under the October 2010 order.

At the conclusion of the trial, the court interpreted the July 2011 stipulation to mean that any fees that were still outstanding were extinguished and forgiven by the stipulation. Thus, the court deemed the $3,500 outstanding balance under the October 2010 order to be forgiven, but did not order that Lynn refund Richard the $4,500 he had paid under the October 2010 order.

We construe marital agreements under the rules of contract interpretation. (*In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439.) We look to the language of the agreement itself, including the express terms and any reasonably implied terms that are necessary to effectuate the parties' intentions. (*Frankel v. Bd. of Dental Examiners* (1996) 46 Cal.App.4th 534, 544-545.)

We agree with the trial court's interpretation of the July 2011 stipulation. The stipulation states that the $15,000 payment is "in full and complete satisfaction of

27

Husband's obligations to Wife's attorney fees . . . through the date of this Stipulation." (See fn. 7, *ante*.) The "full and complete satisfaction" language reflects an intent to dispense with the outstanding balance due under the October 2010 fee order. However, there is no language suggesting that Lynn must refund money to Richard. Lynn's payment of a refund to Richard would be a crucial provision, and it is not reasonable to infer this term absent some language expressly or impliedly indicating the parties intended a refund. Without this language, there is no basis to find that Richard was due a refund.

### III. *Spousal Support*

Challenging the spousal support order, Richard argues: (1) the court failed to fully consider the required statutory factors; (2) the court violated a provision in the July 2011 stipulation that Lynn's debt not be considered when determining spousal support; and (3) the court used an incorrect separation date.

### A. *Consideration of Statutory Factors*

When determining the issue of spousal support, the trial court is required to consider and weigh the factors set forth in section 4320 to the extent they are relevant to the case. (*In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278, 1297; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302.) The statutory factors include the extent to which the parties' earning capacity is sufficient to maintain the marital standard of living; contribution to the supporting spouse's career; the supporting spouse's ability to pay; the parties' needs based on the marital standard of living; the parties' obligations and assets;

28

the duration of the marriage; the opportunity for employment without interfering with the children's interests; the parties' ages and health; tax consequences; the balance of hardships; the goal that the supported party become self-supporting within a reasonable period of time; and any other equitable factors. (§ 4320.)

Richard contends the trial court only considered Lynn's need to meet her expenses and failed to consider the other statutory factors. The record belies this claim. In their pretrial pleadings, the parties extensively addressed the section 4320 factors, and in its written statement of decision the court expressly stated that it had considered all of the section 4320 factors and delineated numerous considerations relevant to these factors. The court noted the parties' ages of 57 and 50, and found that they were both well-educated with secure employment and good health; they enjoyed a middle class standard of living during the marriage; and their marriage was "just slightly less than 'long term'." The court stated that Richard's net monthly income was $8,082; he rents a home with his two adult children; and his monthly expenses were about $6,500. Mother's net monthly income was $4,128; she was currently living rent-free in her mother's home although she expected to pay rent; she received $831 monthly child support; and her mother provided free child care. The court noted that Lynn listed her monthly expenses as $6,800, but lowered this amount to $5,800 in its calculations. The court concluded that, considering Lynn's income and expenses, $1,100 monthly spousal support for three more years was appropriate to enable her to meet her monthly expenses. The court stated that under its order, Lynn would receive spousal support for five years (from 2010 to 2015), which was slightly longer than one-half the length of the marriage, and her excellent employment

29

retirement benefits was one of the reasons it was not necessary to continue spousal support beyond 2015.

Contrary to Richard's assertion, the trial court's conclusion that its spousal support order would allow Lynn to meet her expenses does not mean the court considered *only* her expenses when making its spousal support determination. The record shows the court engaged in a reasonable consideration of the section 4320 statutory factors.

### B.  *Stipulation Not To Consider Debt*

Richard asserts the court improperly considered Lynn's debt when determining spousal support, which was in violation of the parties' July 2011 stipulation. The stipulation states the court "shall not use any of either party's *debt or debt service for fees incurred through the date of this Stipulation* as a basis for making a decision with respect to any amount or duration of spousal support to Wife."  (Italics added, see fn. 7, *ante*.)

In its written statement of decision concerning spousal support, the court stated: "Please note that the Court *is not considering repayment of [Lynn's] loan* [as] part of [Lynn's] 'reasonable' expenses, nor is the Court considering savings."  (Italics added.)  In her June 2012 income and expense declaration, Lynn included two monthly loan payments in her expenses ($700 to her mother and $750 to a bank), and a $400 expense for a savings contribution.

The court's reduction of Lynn's claim for monthly expenses by $1,000 (from $6,800 to $5,800), and its statement that it was not considering Lynn's loan in its calculations, supports that, at least partially, it excluded Lynn's debts from its calculations. The stipulation's reference to the parties' "debt or debt service for fees"

30

through the date of the stipulation is not precise enough to determine what particular debts were expected to be excluded, nor the extent to which Lynn's debts listed on her June 2012 income and expense declaration might be encompassed within the stipulation. On this record, there is no showing the court violated the stipulation when it calculated Lynn's monthly expenses for purposes of spousal support.

### C. *Separation Date*

The parties were married on December 19, 1999, and the court found they separated on September 17, 2009, the date Richard filed the petition for dissolution of marriage. Under the court's findings, they were married for nine years, nine months. Richard, however, maintained that the separation date should be October 12, 2007.[15] On appeal, he reiterates this argument.

The record shows the parties lived together in the family residence until July 2010, when Lynn moved out and went to live with her mother.[16] To support an October 2007 separation date, Richard presented evidence showing that in 2006 they stopped using a joint bank account and they stopped wearing their wedding rings. Richard testified that by the summer of 2007 the marriage had broken down; he ended virtually everything in their marriage (including sexual relations) except activities related to their daughter; and

---

[15] Based on the October 2007 separation date, Richard argued his spousal support obligation should cease at the time of trial due to the length of time he had been providing financial support to Lynn after their separation.

[16] Richard also moved out of the family residence at some point, and the residence was apparently sold in 2011. In its written statement of decision, the trial court stated that the parties "physically and completely separated" on September 17, 2009, the date Richard filed the dissolution petition.

he moved out of the master bedroom and into a loft. However, he did not want to file for divorce yet because he was afraid he would lose his daughter and "a lot of money," so he "hung around." He explained that "for a little while [he] was going along with things, not because the marriage was still viable, but simply because [he] wasn't ready to tell Lynn."

Richard testified that he selected October 12, 2007, as the separation date for symbolic reasons because this was the date he purchased an alarm clock for the loft, which meant that this was where he lived. He and Lynn purchased groceries separately; had separate household items; and "were negotiating everything" including how to split the bills. Richard consulted a family law attorney in December 2007, but did not retain her. In January 2008, he stopped including Lynn's income in his quarterly estimated taxes, and in March 2009 he instructed his accountant to file his 2008 taxes as "married filing separately." On August 18, 2008, he sent an e-mail to his godfather stating that he planned to see a lawyer and that he planned to serve Lynn with divorce papers and move out in October or December 2008. In the e-mail he added, "Unless there's some miraculous recognition on her part, but I've pretty much given up on that. There have been several signs that it's irretrievably broken." In late 2008 he consulted with the family law attorney whom he hired to file the petition in September 2009.

To refute Richard's claimed separation date, Lynn testified she had always had a separate bank account, and in 2006 Richard told her that he had closed their joint account and opened his own separate account because she did not enter information in the check register in a timely fashion. At trial Richard acknowledged he told Lynn this, and also testified he was frustrated because Lynn was not sharing her income that was deposited

32

into her separate account. According to Lynn, Richard started sleeping in the loft because she did not want their new puppy in the master bedroom because he would bark at night and urinate. Lynn testified they attended an office party and a picnic together after October 2007; in April 2009 they refinanced their house; before Richard filed the petition in September 2009 he never told her he wanted to separate; and even after he filed the petition he said he wanted to work on their relationship and they attended marriage counseling. In his trial testimony Richard acknowledged that he did not tell Lynn that he wanted to separate until she was served with the dissolution petition in October 2009.

Explaining why it rejected Richard's October 2007 separation date, the trial court stated: "Their gradual estrangement was really no different than many other cases that this Court has seen. [¶] . . . Although [Richard] testified he slept in the loft of the residence, beginning in October 2007, and bought his own alarm clock, the parties continued to jointly parent their child in the same residence. Most importantly, [Richard] testified that while he was contemplating how to dissolve the relationship and marriage since sometime in 2007, he never told [Lynn] anything to the effect of 'I'm leaving. I'm done with this marriage.' In the absence of clear communication regarding this issue, the Court looks to the actions of the parties. They lived in the same house. They celebrated important events with their child together."

The date of legal separation occurs when there is a complete and final break in the marital relationship. (*In re Marriage of Hardin* (1995) 38 Cal.App.4th 448, 451.) The courts recognize that "rifts between spouses may be followed by long periods of

33

reconciliation, and the intentions of the parties may change from one day to the next . . . ." (*In re Marriage of von der Nuell* (1994) 23 Cal.App.4th 730, 736.) Accordingly, legal separation "requires not only a parting of the ways with no present intention of resuming marital relations, but also, more importantly, *conduct* evidencing a *complete and final* break in the marital relationship." (*Ibid*.)  The inquiry involves both a subjective and objective component:  "First, at least one spouse must entertain the subjective intent to end the marriage; second, there must be objective evidence of conduct furthering that intent." (*In re Marriage of Norviel* (2002) 102 Cal.App.4th 1152, 1158.) The insertion of an objective component recognizes that the best evidence of the parties' subjective intentions "is *their words and actions*." (*In re Marriage of Hardin, supra*, 38 Cal.App.4th at p. 453; *In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1493 ["even if one of the parties testifies to an intent to sever the relationship completely, the trial court can find to the contrary if the concomitant conduct does not support the stated subjective intention"].)

No one factor is determinative on the issue of date of separation; for example, even when a party has stopped sexual relations or moved into a separate residence, other conduct may show that the party had not yet reached the point of intending a complete and final break from the marriage. (*In re Marriage of Baragry* (1977) 73 Cal.App.3d 444, 447-448; *In re Marriage of Hardin, supra*, 38 Cal.App.4th at pp. 451-452, 454, & fn. 5.)  Also, in some circumstances the parties may be deemed to be legally separated even though they reside in the same residence. (*In re Marriage of Davis* (2013) 220

Cal.App.4th 1109, 1118-1119; see *In re Marriage of Norviel, supra*, 102 Cal.App.4th at p. 1164.)[17]

We review a trial court's finding on the date of separation under the substantial evidence standard. (*In re Marriage of Davis, supra,* 220 Cal.App.4th at p. 1113.) We view the evidence in the light most favorable to the judgment, including reasonable inferences that can be deduced from the evidence. (*Ibid*.) Even if the evidence can support more than one reasonable conclusion, we do not reweigh the evidence, and we do not substitute our judgment for that of the trial court but confine ourselves to determining whether any judge reasonably could have made the ruling. (*Ibid.*; *In re Marriage of De Guigne* (2002) 97 Cal.App.4th 1353, 1360.)

The trial court could reasonably find that even if Richard was strongly leaning towards ending the marriage by October 2007 when he was sleeping in the loft rather than in the master bedroom, his objective conduct did not establish a final and complete break in the marriage at this time. In addition to both parties still living in the family residence, as late as 2009 they refinanced the residence and they attended marriage counseling. Further, Richard did not tell Lynn he wanted a separation until he served the dissolution papers in 2009. The court's ruling is supported by Richard's acknowledged

17      We note these date-of-separation standards have been developed primarily in the context of interpreting statutory language in section 771 concerning the characterization of property as community property. (§ 771, subd. (a) [earnings and accumulations of a spouse while living "separate and apart" from the other spouse are separate property]; see e.g., *In re Marriage of Norviel, supra*, 102 Cal.App.4th at p. 1162.) However, the same standards have been used to define date of separation for general purposes in family law cases. (See, e.g., *In re Marriage of Hardin, supra*, 38 Cal.App.4th at pp. 450-451.)

failure to communicate his intentions to Lynn until 2009, coupled with continued cohabitation in the family residence and the other evidence of marital-type conduct in 2009. Although the record can reasonably support more than one conclusion on the separation date, the trial court was not required to adopt the October 2007 date proffered by Richard.

## DISPOSITION

The judgment is affirmed. Richard to pay Lynn's costs on appeal.


HALLER, Acting P. J.

WE CONCUR:


McINTYRE, J.


IRION, J.

36